**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | Case No. MJ-21-04310-001-PCT-CDB |
| Plaintiff, | **ORDER** |
| v. | |
| Philip Alejandro Powers, | |
| Defendant. | |

This case, tried to the Court on November 2-3, 2022, is notable in that few facts are in dispute, rather the crux of the matter is in the legal import of those facts. The charges stem from three separate fires started by the defendant during a hike in a wilderness area near the Sedona, Arizona area on May 27-28, 2018. (Criminal Compl., ECF No. 1.) In short, it is alleged that defendant went on what he intended to be a 17-plus-mile hike, that he got lost, ran out of water and started three fires. Those fires were named by the United States Forest Service ("USFS") as the "Taylor Fire," the "Sycamore Fire," and the "Sycamore 2 Fire." One of these fires, the Sycamore Fire, burned out of control to 230 acres endangering Flagstaff, Arizona, and the watershed. While the defendant acknowledges that he started the fires, at trial he argued the defense of necessity. The United States position is that given the fire restrictions in place at the time, the danger posed by fires in this area and the defendant's actions and lack of adequate preparation for the conditions that he is guilty of the charges filed. In essence, when a person fails to prepare for obvious dangerous conditions and then suffers the inevitable result, they cannot then avail themselves of the defense of necessity for the emergency that they created.

On October 6, 2021, Plaintiff, the United States of America (the "United States") filed a seven-count Complaint against Defendant Philip Alejandro Powers (the "defendant" or "Powers"). *Id.* The defendant was charged with one count of leaving a fire unattended and unextinguished in a National Forest in violation of 18 U.S.C. § 1856, three counts of unlawfully building a fire in a National Forest during fire restrictions in violation of 36 C.F.R. § 261.52(a), and three counts of unlawfully causing timber, trees, brush, and grass to burn in a National Forest without a permit in violation of 36 C.F.R. § 261.5(c). *Id.*[1] Each of these charges is a Class B misdemeanor punishable by a term of imprisonment of up to six months and up to a $5,000.00 fine. The offenses are probation eligible, with up to five years of probation.

The parties submitted two written stipulations of facts which were admitted into evidence. (The Parties' Stipulations for Trial and/or Hr'g's, ECF No. 21.; The Parties' Stipulations for Trial and/or Hr'g's, ECF No. 24.; Order on the Parties' Stipulations, ECF No. 25.) The stipulations are as follows:

- The Coconino National Forest, in the District of Arizona, was in Stage 2 fire restrictions on May 28, 2018 and May 29, 2018, and before and after those dates as set forth in Forest Order No. 04-18-07-F.[2] The stipulation included a copy of Forest Order No. 04-18-07-F. The parties stipulated that Forest Order No. 04-18-07-F was posted on the Coconino National Forest website, https://www.fs.usda.gov/coconino, and at various United States Forest Service offices and locations in the Coconino National Forest in the District of Arizona. (Stipulations, ECF No. 21.; *see also* Pl. Ex. 1.)

- The Prescott National Forest, in the District of Arizona, was in Stage 2 fire restrictions on May 28, 2018 and May 29, 2018, and before and after those

---

[1] Prior to the start of trial, the United States moved to amend its Criminal Complaint to simply state that Counts 1 through 7 occurred in a National Forest. (Compl., ECF No. 1.) The defendant did not object to the amendment, and it was allowed.

[2] The court notes that Forest Order No. 04-18-07-F for Coconino National Forest went into effect on May 4, 2018. (Pl. Ex. 1.)

dates as set forth in Forest Order No. 09-247.[3]  The stipulation included a copy of Forest Order No. 09-247.  The parties stipulated that Forest Order No. 09-247 was posted on the Prescott National Forest website, https://www.fs.usda.gov/prescott, and at various United States Forest Service offices and locations in the Prescott National Forest in the District of Arizona.  (Stipulations, ECF No. 21.; *see also* Pl. Ex. 2.)

- The "Sycamore Fire" was ignited on or about May 28, 2018, in the Sycamore Canyon Wilderness Area in and about the Prescott and/or the Coconino National Forests in the District of Arizona.  The Sycamore Fire was in a remote part of the National Forest and it spread to an area that was about 230 acres in size.  The fire burned timber, shrubs, and grasses, and was contained on or about June 6, 2018.  The parties stipulated that fire suppression by the USFS was primarily conducted with air resources (e.g., aircraft) along with USFS firefighters (i.e., hot shot crews) who were flown into the area. (Stipulations, ECF No. 24.)

- The USFS's recoverable fire suppression costs (i.e., restitution) related to this case and specifically the Sycamore Fire are $293,413.71. *Id.*

- The foundation, admissibility, and entry into evidence of the defendant's medical records from Northern Arizona Healthcare from his treatment on May 28, 2018, and May 29, 2018.  The statements made therein, as well as the diagnoses, laboratory records, assessments, plans, physical exams, complaints, reasons for consultation, patient history, symptoms, impressions, discharge dispositions, and/or discharge condition are admissible into evidence for the truth of the matter asserted therein. *Id.*

- To permit the testimony of Jeff Davison Hardin, MD, via telephone.  The parties stipulated that Dr. Hardin was one of the treating physicians for the

---

[3] The court notes that Forest Order No. 09-247 for Prescott National Forest went into effect on May 22, 2018. (Pl.  Ex. 2.)

defendant at the Verde Valley Medical Center in Cottonwood, Arizona, for the defendant's treatment at the emergency room on May 28, 2018. *Id.*

At the start of trial, the parties further stipulated to the foundation, authenticity, and admission into evidence of the following additional exhibits: Plaintiff's exhibits 3 through 9, 11 through 18, and 23; and Defendant's exhibit 100. (Criminal Ex. List, ECF No. 29; Criminal Ex. List, ECF No. 30.)

The United States called two witnesses were called at trial, Retired USFS Law Enforcement Officer (LEO) Michael O'Neil ("O'Neil") and USFS Firefighter Lawrence Badger ("FF Badger"). (Criminal Witness List, ECF No. 31.) O'Neil investigated the fires, and FF Badger was one of the firefighters who flew into the wilderness area by helicopter to suppress the fires. Two witnesses were called at trial by the defense, Jeff Davison Hardin, MD ("Dr. Hardin"), the defendant's treating physician at the hospital in Sedona, Arizona, and the defendant himself. (Criminal Witness List, ECF No. 28.)

Having considered all of the evidence introduced at trial and the arguments of counsel with the applicable law, the Court makes the following findings of fact and conclusions of law.

**I.    Findings of Fact**

1.    To the extent not addressed below, the stipulations are adopted and incorporated herein as findings of fact. (The Parties' Stipulations for Trial and/or Hr'g's, ECF No. 21.; The Parties' Stipulations for Trial and/or Hr'g's, ECF No. 24.; Order on the Parties' Stipulations, ECF No. 25.)

2.    Phillip Alejandro Powers III ("Powers") is an adult male who was 37 years old at the time of the violations described in the Complaint. At the time, he had been an Arizona resident for over 30 years.

3.    Powers was hiking to prepare for a hunting trip later in the year when he went on what he thought was a 17.8-mile hike in the Coconino and Prescott National Forests near Sedona, Arizona. The hike went into the Sycamore Canyon Wilderness Area, which is a remote part of the National Forest. The hike that Powers went on was the "Taylor

Cabin Loop", an 18.8 mile distance. Powers researched his hike in a book called "A Falcon Guide, Hiking Arizona, A Guide to the State's Greatest Hiking Adventures." (Pl. Ex. 23.) The "Taylor Cabin Loop" was described in this book as a 18.8-mile "strenuous" hike that would take about 12 hours or two days to hike. (Pl. Ex. 23.) Additionally, the book warns that there is usually water in Sycamore Creek during the spring, but that it is dry later in the year. (Pl. Ex. 23.)

4.      Powers confused the "Taylor Cabin Loop" with another hike in that book, the "Cabin Loop." When interviewed on June 2, 2018, Powers provided information about the wrong hike to O'Neil. (Pl. Ex. 14.) Even at trial, Powers seemed confused about which hike he actually attempted. He further testified at trial that he was still confused about what hike he had sent to O'Neil stating, "I was unaware that the book had two different trails for the same hike… it sounded like the same hike as they are both going to Taylor Cabin, so I am kind of confused about what I sent him".[4]

5.      The information provided to O'Neil by Powers was about a hike referred to as the "Cabin Loop", which, according to O'Neil, was approximately 50 miles away from the "Taylor Cabin Loop." That hike was described in the book Powers used as a 17.8-mile loop, of "moderate" difficulty and a hiking time of about two days. (Pl. Ex. 14.)

6.      Powers had some hiking, hunting, and camping experience; however, he testified that he had not been on a hike of this distance for approximately 3 to 4 years.

7.      Powers had never hiked in the Sycamore Canyon Wilderness Area prior to May 27, 2018, and he had not previously been on this specific hike. However, Powers testified that he had been on many hikes in the Sedona, Arizona, area.

8.      Powers knew the importance of carrying sufficient water on hikes in Arizona and understood the dangers of becoming dehydrated.

9.      Powers knew the dangers of wildfire in Arizona.

---

[4] The court notes that the "Taylor Cabin Loop" hike and the "Cabin Loop" hike are two entirely different hikes, in vastly different terrain, to different cabins. The "Cabin Loop" hike is north of the Mogollon Rim in a Ponderosa pine forest. Conversely, the "Taylor Cabin Loop" hike, which Mr. Powers attempted, is located in the high desert, consisting of piñon-juniper woodlands.

10.     Both the Coconino and Prescott National Forests were under Stage 2 fire restrictions. [5]

11.     Stage 2 fire restrictions prohibited individuals from building, maintaining, attending, or using a fire without a permit.  (Pl. Ex. 1.; Pl. Ex. 2.)

12.     Powers knew that the Prescott and Coconino National Forests were in Stage 2 fire restrictions at the time of his hike on May 27, 2018 to May 28, 2018.

13.     Powers did not obtain a permit to have a fire at the time of his hike on May 27, 2018 to May 28, 2018.

14.     Powers was a long-time Arizona resident who described himself as experienced in the outdoors.

15.     Powers arrived at the parking lot for the Dogie Trailhead, in the Coconino National Forest, on May 26, 2018.  Powers parked and camped overnight, so he could start the hike early in the morning to avoid some of the heat.

16.     When Powers arrived at the trailhead, it was hot and dry.  No water sources were viewed in the immediate area. Powers testified that it was unlikely he would find water on the hike.

17.     When interviewed on body camera as to this point in May and June 2018, Powers indicated that he believed he would find water on the trail notwithstanding the very dry and hot conditions.  (*E.g.*, Pl. Ex. 7 at 7:54 to 8:22.; Pl. Ex. 8 at 7:45 to 8:50.; *see also* Pl. Ex. 17.)

18.     Powers began his hike on the morning of May 27, 2018, around 6:00 to 6:30 a.m. He was attempting to complete the Taylor Cabin Loop in one day.

[5] The parties stipulated that the National Forests were under Stage 2 Fire Restrictions: Coconino National Forest, in the District of Arizona, was in Stage 2 Fire Restrictions on May 28-29, 2018, pursuant to Forest Order No. 04-18-07-F. (Pl. Ex. 1.) Prescott National Forest, in the District of Arizona, was in Stage 2 Fire Restrictions on May 28-29, 2018, pursuant to Forest Order No. 09-247. (Pl. Ex. 2.)

19. Powers carried 100 ounces of water in a bladder in his backpack and had an approximate 16-ounce bottle of water. Thus, Powers had approximately 116 fluid ounces of water for the entire hike.

20. Powers also had "Cutie" Oranges, mango, and freeze-dried granola.

21. Along with water and food, Power's backpack contained camping gear including two fuel canisters, a sleeping bag, a hammock, hammock straps, a machete, and a Ka-bar knife.[6] (Pl. Ex. 15.) Powers also testified that he had his cellphone, a 4G hotspot (which doubled as a charger for his cellphone), and a small battery charger.

22. Powers successfully hiked to the Taylor Cabin, which is on the Coconino National Forest in the District of Arizona. The trail was well-marked and easy to follow.

23. Powers did not find a water source.

24. Powers lost the trail several miles past the Taylor Cabin. The terrain and trail was rough and overgrown. At the time, Powers believed he had about four miles to finish the Taylor Cabin Loop and end back at the parking lot where he started.

25. Powers had a global positioning system ("GPS") feature on an application on his smart phone. While it displayed a map of the area – he described it being a topographic map – it was not actively providing him information on his route because he was not getting a cellular phone signal. Powers did not have any alternative navigation options, like a paper map or compass.

26. After getting lost on the afternoon of May 27, 2018, Powers returned to the Taylor Cabin for the night. He originally planned a day hike (not an overnight hike). Powers still had some food remaining, and he found additional food at the Taylor Cabin. Powers saved about 16 to 20 ounces of water for the morning. Powers intended to backtrack on the trail he had hiked in on to return to his vehicle.

27. Because Powers lost the trail and returned to the Taylor Cabin, his anticipated 17.8-mile hike became longer, possibly more than 20 miles. As such, he admitted that he

---

[6] At trial, O'Neil testified that a Ka-bar knife is a military fighting tool, that could also be used for trenching.

did not have enough water for the return hike. (According to "A Falcon Guide," the hike Powers actually went on was 18.8 miles. (Pl. Ex. 23.))

28.     Power's cell phone was low on battery at this point of the day on May 27, 2018. He turned it on approximately every hour to check for a signal and attempted to send voicemails to friends to alert them of his situation.[7] He also used his WiFi hotspot device to search for a signal. He planned to use the hotspot to charge his phone if he found a signal.

29.     While at the cabin, Powers signed a trail log, indicating he was low on water, and hoping to find Geronimo or Dobey Springs. (Pl. Ex. 17.) Geronimo and Dobey Springs are in the general vicinity of Taylor Cabin.

30.     Powers did not sleep well at the Taylor Cabin due to leg cramps. This is when he began to worry that he was physically unable to return to his vehicle.

31.     Powers heard a rattlesnake in the cabin. Fearing that the rattlesnake was going to strike him, he killed the snake. He then threw the dead snake into the firepit near the cabin. Powers set up a hammock outside.

32.     Concerned about his ability to get back, Powers purposefully, voluntarily, and admittedly started a fire that night, testifying that he hoped the smoke would attract attention, although he acknowledged that smoke wouldn't be seen at night. This fire was named the "Taylor Fire," which was in the area of the Taylor Cabin in the Coconino National Forest.

33.     The Taylor Fire was not started in a fire ring or pit, and it burned approximately $1/10^{th}$ of an acre (including grass, brush, small trees, and timber). Powers did not clear any brush or flammable material away before starting the fire.

34.     Powers started the Taylor Fire on the evening of May 27, 2018, at about 9:00 p.m. At the time, Powers still had some water left, about 16 to 20 ounces. He also had food and shelter.

---

[7] He later learned his voicemails were only delivered once he was out of the wilderness area.

35. There was a fire ring or pit in very close proximity to the Taylor Cabin, and it was only a few feet from where Powers started the Taylor Fire.

36. The Taylor Fire went out on its own.

37. Powers laid in the hammock near the fire site. He slept little due to his legs cramping.

38. Powers started the hike back to the trailhead parking lot early in the morning on May 28, 2018, while it was still dark, due to the anticipated heat of the day. Powers ate a small breakfast before he left on the hike. A few miles into the hike back, Powers' testified that his legs started to cramp, that his body began to "shut down," and that he could only hike short distances before he had to stop and rest in the shade.

39. Powers' cellphone could not get a signal – he unsuccessfully tried contacting 9-1-1 and a friend via phone. His phone eventually ran out of battery charge.[8]

40. Powers ran out of water and drank some of his own urine out of desperation.

41. Powers was approximately 3 to 4 miles back on the trailhead when he believed he could no longer hike any further.

42. Powers knowingly and intentionally lit a second fire in a dead tree ("snag"). He chose the snag because there was dead vegetation around it and he hoped it would create smoke and attract attention. The second fire that Powers set was named the "Sycamore Fire," which was in the Prescott National Forest near the boundary of the Coconino National Forest. Powers started this fire on the morning of May 28, 2018.

43. The Sycamore Fire was not started in a fire ring. Powers did not clear brush or flammable material away before starting this fire.

---

[8] Powers testified that he had a Verizon mobile 4G hotspot – a device used to share the network with other devices to access the Internet – with him. Powers testified the hotspot had a backup battery but that his cellphone still ran out of power during the hike. Other than the hotspot device and small battery charger, Powers did not have a way to charge his phone such as a solar charger.

- 9 -

44.     Powers stayed in the area of the Sycamore Fire for about an hour hoping that the smoke would bring help and he thought the fire was going out.  However, Powers did not make sure that the fire was out, prior to leaving the area.

45.     Powers took his cellphone, 4G hotspot device, battery charger, and keys with him. He abandoned his pack near the snag and continued down the trailhead.

46.     Powers knew that the fire was not out when he walked away.  In one of Powers' interviews with O'Neil that was recorded on a body camera, Powers said, "It wasn't that big when I left it.  I thought it was going out." (Pl. Ex. 8, 35:42-36:01.)

47.     Powers knowingly, willingly, voluntarily, intentionally, and recklessly left the Sycamore Fire unattended and without extinguishing it. Powers knowingly, willingly, voluntarily, intentionally, and recklessly permitted the Sycamore Fire to burn and spread beyond his control, in that he left the area of the Sycamore Fire when the fire was not completely extinguished in an area that was extremely dry.

48.     The Sycamore Fire eventually spread beyond Powers' control and burned approximately 230 acres of the National Forest in the District of Arizona.  The Sycamore Fire burned grass, brush, and timber in a National Forest.

49.     Powers eventually saw a small plane. About 30 minutes later he saw a helicopter that had circled and left. Approximately, 30 minutes later the helicopter returned.

50.     In an attempt to be seen, Powers cut off his orange boxer brief underwear and waved them around on a walking stick. Powers started a third fire with his lighter, concerned that the helicopter did not see him.[9]

51.     The third fire that Powers set was named the "Sycamore 2 Fire," which was in the Prescott National Forest near the boundary of the Coconino National Forest.  Powers started this fire on the morning of May 28, 2018.

52.     The Sycamore 2 Fire was not started in a fire ring.  Powers did not clear brush or flammable material away before starting the fire.  It burned an area of grass, brush, and timber in a National Forest.

---

[9] Powers was wearing all camouflage attire.

53.     The Sycamore 2 Fire ultimately burned a three-foot circle.

54.     After Powers started the Sycamore Fire, reports of smoke and/or a fire were made to the USFS in the Red Rock Ranger District of the Coconino National Forest on the morning of May 28, 2018.

55.     A USFS Helitak team in a helicopter was sent to the area of the Sycamore Fire. FF Badger was one of the firefighters on that crew. FF Badger saw a male subject under a tree, who was later identified as Powers.

56.     Powers was assisted into the helicopter where the crew gave Powers some water which he was able to drink in small sips. Although there is no USFS protocol for passengers on the helicopter, the crew chose to fly Powers out.

57.     Powers was flown to the Sedona, Arizona, airport, where he was met by an ambulance. Powers was assisted in walking with two people to the ambulance.

58.     In the ambulance, now-retired USFS Law Enforcement Officer Michael O'Neil first met Powers. O'Neil asked Powers about the fires, Powers responded, "It was me." Powers told O'Neil about the hike, including killing the rattlesnake and drinking his urine, and he took full responsibility for igniting the fires. He told O'Neil he did not want to light them, and that lighting them was a last resort. (Pl. Ex. 6.)

59.     Emergency Medical Technicians started Powers on an IV with fluids and transported him to Sedona Emergency Department, a satellite campus of the Verde Valley Medical Center.

60.     Dr. Jeff Hardin treated Mr. Powers at the Sedona Emergency Department on May 28, 2018. Dr. Hardin is board certified in emergency medicine and has practiced medicine for more than 24 years and he is familiar with the medical issues created by heat and exertion in the Sedona area.

61.     Dr. Hardin diagnosed Powers with weakness, heat exhaustion, acute renal failure, rhabdomyolysis, and dehydration. These conditions can be severe and cause permanent damage. Acute Renal Failure can cause kidney damage requiring lifelong dialysis. Acute Renal Failure can have many causes. Rhabdomyolysis can cause permanent

kidney and/or heart damage. Rhabdomyolysis can be caused by dehydration, but more often it is caused by overexertion.

62.     Dr. Hardin concluded that Powers was moderately dehydrated, suffering from heat exhaustion (but not the more serious heat stroke), early onset renal failure, and Rhabdomyolysis.  When asked about the severity of the early onset renal failure, Dr. Hardin described it as a mild case and testified that Powers did not require dialysis. Further, Dr. Hardin could not be certain that the Rhabdomyolysis was caused by dehydration as it could have been caused by the exertion during the strenuous hike.

63.     Dr. Hardin did not have concerns about Powers' mental state at the time and would not expect Powers' conditions to affect his mental state.

64.     Dr. Hardin testified that while Powers' was moderately dehydrated, left untreated (e.g., another 24 hours) it would have been life threatening. Powers was experiencing significant adversity with regards to his health at the time he started the Sycamore and Sycamore 2 Fires.

65.      As articulated more fully below, this adversity could have been avoided and did not relieve him of the responsibility of acting in a reasonable manner under the circumstances.

66.     O'Neil interviewed Powers a second time in the Sedona Emergency Room. Powers immediately asked about the fires, told O'Neil he had ignited them, described what happened on the hike including the rattlesnake and drinking his urine, and answered all of O'Neil's questions.

67.     Powers was treated in the Emergency Department with an IV and fentanyl for pain. Dr. Hardin consulted with a nephrologist and both physicians recommended Powers be admitted to the hospital. Despite the treatment Powers had received, Dr. Hardin did not believe it was safe for Powers to leave the Emergency Department.

68.     Powers remained in the hospital for one night. The following day he felt somewhat better. He elected to leave the hospital that day.

69. FF Badger stayed on the scene and/or area of the Sycamore Fire. He, along with others, hiked to the Taylor Cabin to inspect and assess the Taylor Fire. He found that the Taylor Fire was about 1/10th of an acre and had burned out.

70. The Sycamore Fire was contained on or about June 6, 2018. Containment does not mean that the fire was out. Instead, it means that the forward progression of the fire had been stopped.

71. Because of the remote area of the fire, the resources used to fight the fire were air assets (e.g., helicopters) and firefighters on the ground. (The Parties' Stipulations for Trial and/or Hr'g's, ECF No. 24.)

72. Due to the location of the Sycamore Fire, it was a threat to Flagstaff, Arizona, as well as the nearby watershed.

73. The recoverable fire suppression costs (i.e., restitution) incurred by the USFS for the Sycamore Fire are $293,413.71. *Id.*

74. Powers acknowledged that he had no water purification system (e.g., filters or tablets) for hike.[10]

75. Dr. Hardin testified that a regular person sitting in the shade in 100-degree heat in Sedona, Arizona, would likely need at least a gallon (128 fluid ounces) of water per day to stay properly hydrated, and that would be on the low side. Further, that a person on an approximately 18-mile or so hike would need at least two to three gallons of water to stay properly hydrated.

76. Given the conditions that existed in the Sycamore Canyon Wilderness Area on May 27, 2018, 116 ounces of water was profoundly insufficient for a hike of this difficulty in the temperatures and dry conditions of the time.

77. Powers relied on his smart phone for light, navigation and communication. Cell phone service in the Sycamore Canyon Wilderness Area was sporadic, at best.

---

[10] Powers testified that he had left a water filter in his vehicle at the trailhead, and on body camera video he can be heard saying he left his LifeStraw™ at home.

78. Powers did not have a paper map, guidebook, GPS device, compass, communication or signaling device (even a mirror), first aid or medical kit or any alternative light sources.

79. Powers did not bring sufficient food for a hike of this duration in these conditions.

80. Powers was ill-equipped for a hike of this length and difficulty.

81. The Court finds that Powers was reckless in his preparations for this hike.

82. The Court finds that Powers created the condition that caused him to start the emergency signal fires.

83. The Court further finds that the defendant had other options other than starting wildfires. For example, Powers could have started the Taylor Fire in the fire ring that was only feet away from where he started the fire in the brush. Powers also could have made a fire ring or pit when he started all three fires, and he could have removed flammable material to keep the fire from spreading.

84. Powers did not have a permit to start any of the three fires. Thus, his starting of the fires was *per se* illegal.

85. Powers knowingly, willingly, voluntarily, intentionally, and recklessly started the Taylor Fire, the Sycamore Fire, and the Sycamore 2 Fire, when prohibited by Forest Service Order. *Supra*, note 3.

86. Powers knowingly, willingly, voluntarily, intentionally, and recklessly left the Sycamore Fire, allowing it to burn unattended and spread beyond Power's control.

87. By starting the Taylor Fire, Sycamore Fire, and Sycamore 2 Fire, Powers knowingly, willingly, voluntarily, intentionally, and recklessly caused timber, trees, slash, brush, or grass to burn, when prohibited by Forest Service Order. *Id.*

88. The fires described above all occurred in the Prescott and/or Coconino National Forests, in the District of Arizona, which are forests owned by the United States and under the jurisdiction of the United States Forest Service (which is part of the United States government).

89. Any finding of fact deemed a conclusion of law is so adopted.

## II. Conclusions of Law

The defendant readily admitted starting three signal fires in a National Forest in the Sycamore Canyon Wilderness Area of the Coconino and Prescott National Forests in the District of Arizona. The United States posits that Powers had the requisite criminal intent when he started the fires and, in the case of the Sycamore Fire, when he left the area and permitted the fire to burn unattended and spread beyond his control. The United States further argued that Powers was reckless in his preparation for this hike in a wilderness area during Stage 2 fire restrictions, and this recklessness created the condition where Powers believed he needed to start one or more signal fires. Powers argued that he should be found not guilty on Count 1 because he lacked criminal intent. (Mem. of P. & A. in Supp. of Def.['s] Mot. for J. of Acquittal as to Count 1, ECF No. 34.) He further argued that he should be found not guilty on all counts based on a necessity defense. In support of his argument, he testified that he started the fires to save his life after getting lost on a hike in the wilderness area.

### A. Count 1 of the Complaint, a Violation Under 18 U.S.C. § 1856.

Under Count 1 of the Complaint, the defendant was charged with one count of leaving a fire unattended and unextinguished in a National Forest in violation of 18 U.S.C. § 1856. (Compl., ECF No. 1.) [11] The elements of this count are as follows:

> 1. That on or about May 27, 2018 to May 28, 2018, in a National Forest,

---

[11] Section 1856 states: "Whoever, having kindled or caused to be kindled, a fire in or near any forest, timber, or other inflammable material upon any lands owned, controlled or leased by, or under the partial, concurrent, or exclusive jurisdiction of the United States, including lands under contract for purchase or for the acquisition of which condemnation proceedings have been instituted, and including any Indian reservation or lands belonging to or occupied by any tribe or group of Indians under the authority of the United States, or any Indian allotment while the title to the same is held in trust by the United States, or while the same shall remain inalienable by the allottee without the consent of the United States, leaves said fire without totally extinguishing the same, or permits or suffers said fire to burn or spread beyond his control, or leaves or suffers said fire to burn unattended, shall be fined under this title or imprisoned not more than six months, or both." 18 U.S.C. § 1856.

2. upon lands owned, controlled, or under the partial jurisdiction of the United States,

3. the defendant having kindled or caused to be kindled, a fire in or near a forest, timber, or other inflammable material,

4. did leave said fire without totally extinguishing the same, or permitted or suffered said fire to burn or spread beyond his control, or left or suffered said fire to burn unattended.

18 U.S.C. § 1856. The fire in Count 1 refers to the Sycamore Fire. (Compl., ECF No. 1.)

The Complaint tracks the language of the statute, although the United States charged in the conjunctive rather than in the disjunctive used in Section 1856. (*Compare* Compl., ECF No. 1., *with*, 18 U.S.C. § 1856.)[12] Under the plain language of the statute, to prevail the United States must prove that the defendant: (1) left the Sycamore Fire without totally extinguishing it, (2) permitted the Sycamore Fire to burn or spread beyond the defendant's control, (3) suffered the Sycamore Fire to burn or spread beyond the defendant's control, (4) left the Sycamore Fire to burn unattended, or (5) suffered said fire to burn unattended. *See* 18 U.S.C. § 1856.

The Court finds that Powers started the Sycamore Fire on May 28, 2018, in the Prescott National Forest, which is land owned and under the control of the United States (i.e., the United States Forest Service). The court also finds that Powers purposefully, intentionally, willingly, and voluntarily started the Sycamore Fire in a dead tree snag that contained other dead material around it. He strategically picked the tree and surrounding dead material as he believed it would ignite easily and generate a significant amount of smoke. He also did not make efforts to clear the area to keep the fire contained. As much

---

[12] It is well settled that the United States may charge in the conjunctive but prove in the disjunctive when the statute so supports. *E.g.*, *United States v. Abascal*, 564 F.2d 821, 832 (9th Cir. 1977) ("The government may charge in the conjunctive form that which the statutes denounce disjunctively, and evidence supporting any one of the charges will support a guilty verdict."); *United States v. Arias*, 253 F.3d 453, 457-58 (9th Cir. 2001)("When, as here, the statute speaks disjunctively, the conjunctive is not required even if the offense is charged conjunctively in the indictment.").

of this evidence was not in dispute, the court finds that the United States proved the first three elements beyond a reasonable doubt in Count 1 of the Complaint.

As to the fourth element, the court finds that the United States proved beyond a reasonable doubt that Powers did not totally extinguish the Sycamore Fire, that he left it because he thought it was going out, and that the fire was permitted to burn beyond the defendant's control.[13] At trial, Powers admitted that the Sycamore Fire was not completely out when he walked away from it. In one of his interviews with O'Neil in 2018 that was recorded on a body camera, Powers said, "It wasn't that big when I left it. I thought it was going out." (Pl. Ex. 8, 35:42-36:01.) Powers also testified that he knew the importance of putting out a fire, that he knew it was hot and dry when he started the hike, that he knew of the substantial fire risks in Arizona, and that he knew of the fire restrictions at the time of hike. Thus, the court finds that Powers voluntarily and willingly (1) left the Sycamore Fire without totally extinguishing it, (2) he permitted the fire to burn (and/or spread) beyond his control, and (3) he left the fire to burn unattended.[14]

The last element of Count 1 hinges on Power's intent. While intent is not expressly required under this section, the Ninth Circuit has held that Section 1856 requires a finding of "criminal intent." *United States v. Launder*, 743 F.2d 686, 689 (9th Cir. 1984).[15]

In *Launder*, the defendant, Robert W. Launder ("Launder"), went camping with his friends at Mount Lemmon in the Coronado National Forest near Tucson, Arizona. *Id.* at 688. The next day, Launder decided to hike around the campground area by himself, and

---

[13] The parties stipulated that approximately 230 acres of timber, shrubs, and grasses burned in the Prescott and/or Coconino National Forests as a result of the Sycamore Fire. (The Parties' Stipulations for Trial and/or Hr'g's 1 ¶ 1, ECF No. 24.) Thus, the fire was unquestionably beyond the defendant's control.

[14] The United States only has to prevail on one of these theories to support the fourth element of the charge, but the evidence supports the defendant's guilt on at least three separate theories. *See* 18 U.S.C. § 1856.

[15] It is important to recognize that the *Launder* case did not deal with a situation where (1) the defendant left the fire without totally extinguishing it and (2) where the defendant left the fire to burn unattended. 743 F.2d at 688. Indeed, the Ninth Circuit did not analyze the specific situation and allegations that are at issue in the instant case.

he left his campsite intending to hike for one or two hours. *Id.* Launder took no food, water, or camping gear with him. *Id.* Soon thereafter, Launder found himself in an unfamiliar and rough area, and he lost track of time and distance. *Id.* At about 6:00 p.m., Launder realized that he could not find his way back to either his campsite or Tucson. *Id.* In an attempt to attract attention, Launder decided to light a signal fire. *Id.* Launder started a signal fire, but did so only after clearing an area on a rock ledge approximately five to ten feet across. *Id.*

Soon after Launder lit the signal fire, a gust of wind spread the fire and ignited four smaller fires in the area around him. *Id.* Launder attempted to put the fires out but was unable to do so and the fire escaped his control. *Id.* The fire spread and became a wildfire that came rapidly toward him. *Id.* To avoid injury, Launder ran from the fire. *Id.*

About 20 minutes later, Launder saw a helicopter in the area of the fire. *Id.* Launder tried unsuccessfully to attract the attention of the helicopter. *Id.* When this failed, Launder cleared another area and ignited a second fire. *Id.* Launder was sighted by the helicopter crew, and they landed nearby to rescue him. *Id.* Upon rescue, Launder freely admitted to the helicopter crew, and later to the fire suppression specialist from the USFS, that he had set the first fire as a signal fire when he got lost. *Id.* The Ninth Circuit noted that Launder "vigorously tried to combat" the first signal fire, and "even helped the authorities put out the second signal fire." *Id.* at 690.

At the time Launder lit his fires, the risk of fire danger in the Coronado National Forest was significant. *Id.* at 688. While notices of the fire conditions had been posted on the highway at the base of Mount Lemmon, the USFS had not prohibited campers from lighting fires. *Id.*

Launder's charges under 18 U.S.C. § 1856, only related to the first fire he set which ultimately spread out of control. *Id.* Launder argued at the outset of trial that the evidence would show that he had no criminal intent in leaving the first fire as he did everything possible to extinguish it. *Id.* The United States argued that 18 U.S.C. § 1856 was a regulatory offense that does not require a showing of criminal intent. *Id.* The district court

agreed with the United States that the offense set forth in 18 U.S.C. § 1856 is a regulatory offense that does not, under *Morissette v. United States*, 342 U.S. 246 (1952), require a showing of criminal intent. *Launder*, 743 F.2d at 688. Launder was convicted under 18 U.S.C. § 1856 and sentenced to three years' probation. *Id.* at 688.

Launder appealed and the Ninth Circuit reversed. *Id.* The court stated, "The language of 18 U.S.C. § 1856 in no way suggests that Congress intended to impose strict criminal liability." *Id.* at 689. In pertinent part, the *Launder* court further stated:

> In including the terms "permits" and "suffers" in section 1856 Congress evidenced its intention that a defendant not be found culpable under the statute unless the government has shown a willingness on his part to allow the fire to burn beyond control, *or at the least that he failed to make all reasonable efforts to extinguish the fire.* Moreover, we think the use of the terms "permits" and "suffers" illustrates the general intent of Congress with respect to the entire statute and that Congress intended that a showing of criminal intent be required regardless of which clause of the statute is invoked in a particular case.

743 F.2d at 689-90 (emphasis added).

Ultimately, the court found that the United States did not claim Launder possessed the requisite criminal intent. After lighting the signal fire, Launder vigorously tried to combat it and only left once it had spread beyond his control. He immediately confessed his actions to the rescue team and United States Forest Service. Lastly, he "even helped the authorities put out the second signal fire. *Id.* at 690. "Such activities do not lend themselves to the view that Launder engaged in the willful act of leaving a fire without extinguishing it or 'permitted or suffered a fire to burn or spread beyond his control.'" *Launder*, 743 F.2d at 691 (internal brackets omitted).

The court finds that *Launder* is distinguishable from the facts of the instant case. 743 F.2d at 688-90. When Launder realized he became lost, he cleared a rock ledge approximately five to ten feet across and used small twigs, leaves, and grass as fuel to light

a signal fire. *Id*. at 688. This act demonstrates a precautionary measure in ensuring that the signal fire would not spread. Nonetheless, a gust of wind spread his signal fire and started four smaller fires in the area, which Launder attempted to extinguish. *Id*. Launder then only ran away from the fire when it began spreading quickly and coming rapidly towards him, to avoid injury to his person. *Id*.

In the current case, the court finds that Powers found himself in a situation that he created. Further, he did not take precautionary measures when igniting the Sycamore Fire. To the contrary, he did the opposite. Powers intentionally lit a dead tree snag knowing that there was significant dry matter surrounding the snag to create a larger fire. While igniting the fire only supports one element of 18 U.S.C. § 1856, this analysis bolsters Power's intent of creating a larger fire, which ultimately spread beyond his control.

Further, the court finds that Powers did not make any affirmative efforts to extinguish, or at minimum, contain the Sycamore Fire. Powers did not clear the area where he started the Sycamore Fire. The defendant, who had both a machete and a ka-bar knife, also could have built a fire pit or ring.[16] Powers also had access to an existing fire ring at the Taylor Cabin, where he still had shelter, and could have started a signal fire during daylight hours. Yet, nothing in his testimony suggested that he made such efforts.

Lastly, Powers willingly and knowingly walked away from the Sycamore Fire while it was still burning because he thought it was going out. (*E.g.*, Pl. Ex. 8, 35:42-36:01.) He did not attempt to put the fire out prior to his departure. In *Launder*, the Ninth Circuit distinguishes the term "leaves" in the statute, stating "[it] connotes a voluntary leaving by the defendant and does not embrace an involuntary departure compelled by events over which the defendant has no control." 743 F.2d at 690, note 2. While Launder left the fire, once it was beyond his control and rapidly spreading towards him, Powers voluntarily decided to continue further down the trail, leaving the fire unattended and allowing it to

---

[16] During O'Neil's testimony, he explained that a Ka-Bar knife can be used for trenching purposes. *See supra*, note 5.

spread. Therefore, Powers departure from the Sycamore fire was voluntarily and within his own control.

Accordingly, the Court finds that the defendant had the requisite criminal intent pertaining to the Sycamore Fire. The Court finds that the defendant had the requisite intent of knowingly, willingly, voluntarily, intentionally, and recklessly (1) leaving the Sycamore Fire without totally extinguishing it, (2) permitting the fire to burn (and/or spread) beyond his control, and (3) leaving the fire to burn unattended.

As such, the Court finds the defendant guilty of Count 1 of the Complaint.

**B.    Counts 2-4 of the Complaint, Violations under 36 C.F.R. § 261.52(a)**

Under Counts 2, 3, and 4 of the Complaint, the defendant was charged with unlawfully building, maintaining, and attending a fire in a National Forest when prohibited to do so by order in violation of 36 C.F.R. § 261.52(a). (Compl., ECF No. 1.)  In that regard, the defendant was charged with one count each for the Taylor, Sycamore, and Sycamore 2 fires. *Id.*

Section 261.52(a) has no intent required under the plain language of the regulation. Under 36 C.F.R. § 261.1(c), intent is not an element of any offense under part 261 unless otherwise specified.    Thus, merely starting the fires – due to the fire restrictions – was *per se* illegal.  *See Launder*, 743 F.2d at 691 ("We readily acknowledge that protecting forests from fires which every year ravish invaluable acres of forest lands in the United States is a legitimate concern. However, the United States Forest Service has the authority to prohibit, by order, all fires in a given area whenever circumstances warrant such action. 36 C.F.R. § 261.52 (1983).").

The defendant stipulated that both the Coconino National Forest and the Prescott National Forest were in Stage 2 fire restrictions on May 28, 2018 and May 29, 2018. (The Parties' Stipulations for Trial and/or Hr'g's, ECF No. 21.; *see also* Pl. Ex. 1.; Pl. Ex. 2.) The evidence supports that the fire restrictions were posted at various locations in the forest and online, and the defendant testified that he was aware of the restrictions (although his

knowledge is not required). The Stage 2 fire restrictions prohibited the building, maintaining, attending, or using a fire under 36 C.F.R. § 261.52(a). *Id.*

### a. Taylor Fire

The court finds that on the evening of May 27, 2018, at about 9:00 p.m., Powers lit the Taylor Fire near the Taylor Cabin. The fire was not started in a fire ring or pit, and it burned approximately 1/10th of an acre. Powers further testified to starting this fire with a lighter.

### b. Sycamore Fire

The court finds that on the morning of May 28, 2018, Powers lit a second fire in a dead tree ("snag"). The Court further finds that Powers did not clear any brush or flammable material away before starting the fire. This fire burned approximately 230 acres of the National Forest. Powers further testified to starting this fire with a lighter and leaving it unattended, when he assumed it was going out.

### c. Sycamore 2 Fire

The court finds that on the morning of May 28, 2018, Powers started the Sycamore 2 Fire. This fire was not started in a fire ring and ultimately burned a three-foot circle. Powers testified to starting this fire with a lighter.

In summation, Powers admitted to starting all three fires in a National Forest with a lighter, and the evidence is undisputed that he had no permit to do so. Here, both forests were in Stage 2 fire restrictions. (Pl. Ex. 1.; Pl. Ex. 2.) Starting the fires was *per se* illegal under Title 36 of the Code of Federal Regulations. (*See* Compl. Counts 2-7, ECF No. 1.) As such, the Court finds that the defendant built, maintained, and attended a fire when prohibited to do so by order. As such, the Court finds the defendant guilty of Counts 2, 3, and 4 of the Complaint.

### C. Counts 5-7 of the Complaint, Violations under 36 C.F.R. § 261.5(c)

Under Counts 5, 6, and 7 of the Complaint, Powers was charged with unlawfully causing timber, trees, brush, and grass to burn in a National Forest without a permit in

violation of 36 C.F.R. 261.5(c). (Compl., ECF No. 1.)  In that regard, Powers was charged with one count for each of the Taylor, Sycamore, and Sycamore 2 fires. *Id*.

Under the plain language of Section 261.5(c), there is no intent requirement.[17] Again, under 36 C.F.R. § 261.1(c), intent is not an element of any offense under part 261 of the regulations unless otherwise specified.  *See also United States v. Polaris Sales, Inc.*, 2020 WL 4430375, at *3 (C.D. Cal. July 31, 2020)("As a preliminary matter, Yanez claims that subsections (c), (d), and (e) require intentional conduct. However, 36 C.F.R. section 261.1(c) unequivocally states that 'unless an offense set out in this part specifies that intent is required, intent is not an element of any offense under this part.' Intent is not expressly required in section 261.5; thus, Yanez's first argument is unavailing.")(internal citation and brackets omitted).

The court concluded that Powers started all three of these fires with a lighter in a National Forest, and that he did not have a permit to start the fires. *Supra*, 22 at 12-13.  The court further finds these fires caused grass, brush, and timber to burn. (*E.g.*, Pl. Ex. 11.; Pl. Ex. 12.; Pl. Ex. 13.; *see also* The Parties' Stipulations for Trial and/or Hr'g's ¶ 1, ECF No. 24.) Accordingly, the Court finds that the defendant unlawfully caused timber, trees, brush, and grass to burn without being authorized to do so by a permit. As such, the Court finds the defendant guilty of Counts 5, 6, and 7 of the Complaint.

### D.     The Defendant's Necessity Defense

In closing argument, Power's raised, for the first time, the defense of necessity to all of the charges in the Complaint. "The necessity defense is an affirmative defense that protects the defendant from criminal liability for violation of a criminal statute." *Raich v. Gonzales*, 500 F.3d 850, 861 (9th Cir. 2007). The necessity defense is one that does not negate any of the elements of a crime but instead serves as a justification or excuse. *See United States v. Sandoval-Gonzalez*, 642 F.3d 717, 723 (9th Cir. 2011)(explaining that necessity is a "classic affirmative defense" that does not "negative any of the elements of

---

[17] Section 261.5(c) states: "The following are prohibited: … (c) Causing timber, trees, slash, brush or grass to burn except as authorized by permit."  36 C.F.R. 261.5(c).

the crime."). Essentially, the necessity defense functions as a justification for the prohibited conduct due to the circumstances under which the defendant committed the violation. *Raich*, 500. F.3d at 861.

### a. Failure to Prove Necessity Defense by Preponderance of the Evidence

The defendant must prove necessity by a preponderance of the evidence. Manual of Model Criminal Jury Instr. 6.6 (9th Cir. Jury Instr. Committee 2010, Last updated Mar. 2018) The Ninth Circuit's jury instructions for necessity states that "a defendant acts out of necessity only if at the time of the crime charged:"

> First, the defendant was faced with a choice of evils and chose the lesser evil;
>
> Second, the defendant acted to prevent imminent harm;
>
> Third, the defendant reasonably anticipated his conduct would prevent such harm;
>
> Fourth, there were no other legal alternatives to violating the law.

*Id*. If each of these things is found by a preponderance of the evidence the defendant must be found not guilty. *Id.* "It is not enough … that the defendant had a subjective but unreasonable belief as to each of these elements. Instead, the defendant's belief must be reasonable, as judged from an objective point of view." *United States v. Perdomo-Espana*, 522 F.3d 983, 988 (9th Cir. 2008).

The court finds that the defendant's necessity defense fails. First, Powers harm was not imminent. Second, his actions in setting all the fires, in the manner that he set them, was objectively unreasonable given the circumstances.

In *Perdomo-Espana*, the Ninth Circuit found that a defendant's medical condition of diabetes, necessitating emergency care, was not considered imminent harm for purposes of a necessity defense. *Id* at 988. At trial, the Defendant testified that he illegally entered the United States fearing for his life and seeking medical attention for his diabetes. *Id* at

985. He further testified that he previously had a stroke precipitated by his high blood sugar and had been treated with insulin injections. *Id.* On the day he attempted to cross into the United States, he stated his blood sugar was 480 – the same level it had been during his previous stroke. *Id.* During 4-5 hours of questioning following his capture, "Perdomo displayed no cuts, bruising, shaking, tremors, excessive sweatiness, signs of malnourishment, or apparent strange behavior." *Id.* He was later taken to the hospital and admitted to the emergency room, where his blood sugar level was recorded at 340. *Id.* Dr. Vincent Knauf, Perdomo's treating emergency physician, characterized his glucose level as a "severe elevation." *Id.* "However, Dr. Knauf [opined that], Perdomo was not facing serious or imminent risk of bodily harm at that time; although he needed longer-term care, Perdomo was classified as a "non-urgent" patient." *Id.* Because "Dr. Knauf concluded that Perdomo was in no immediately dire medical condition when he was treated in the emergency room[,]" the Ninth Circuit found that Perdomo's crossing was not averting any objective, imminent harm. *Id* at 988.

This court applies the same reasoning to the current case in evaluating whether Powers harm was imminent. Powers called Dr. Jeff Hardin as a witness. Dr. Hardin is board certified in emergency medicine and has practiced medicine for more than 25 years. The court found Dr. Hardin to be a credible witness based on his certifications, training, and experience. He treated Powers upon his arrival to Sedona Emergency Department on May 28, 2018 and diagnosed him with acute renal failure, rhabdomyolysis, dehydration, and heat exhaustion. Although he testified stating these conditions can be severe and cause permanent damage, he further explained that Powers conditions were moderate when asked about the severity of his diagnosis. He testified that Powers was moderately dehydrated, that Powers was suffering from heat exhaustion (but not heat stroke), and that Powers was suffering from early onset renal failure (but that this diagnosis was of mild severity). The court finds that while these ailments could cause significant discomfort, Mr. Powers was

not yet in a life-threatening state, which necessitated the actions of starting a series of fires[18]. Therefore, the court finds that Powers harm was not imminent.

The court also finds that Mr. Powers had alternatives other than starting or potentially starting a series of unrestrained forest fires. First, Powers could have cleared one or more areas to start a signal fire. *See Launder*, 743 F.2d at 688 (Launder "cleared an area on a rock ledge approximately five to ten feet across and, using small twigs, leaves and grass as fuel, lit a signal fire."). He further could have built a fire ring or dug a fire pit. It is undisputed that there were materials available for him to build a fire ring, and the defendant had tools with him that he could have used to dig a fire pit. (*See*, *e.g*., Pl. Ex. 15.) Powers could have also started a signal fire at the Taylor Cabin in the fire pit at a time when he still had food, water, and shelter. Lastly, as to the Sycamore Fire, he could have made sure the fire was out before leaving it unattended. While the court notes that these crimes would have still been *per se* illegal based on the Forest Service Orders, Powers had other objectively reasonable options in the manner in which he choose to start signal fires, and choose not to.

Thus, because Powers was not experiencing imminent harm and his actions were not objectively reasonable, the court finds that Powers did not satisfy, by preponderance of the evidence, a necessity defense.

### b. Defendant Created the Necessity

Powers necessity defense fails because he created the conditions underlying the supposed necessity. Powers was reckless and negligent in his preparation for a hike of this magnitude from the outset. "[The necessity defense is] unavailable where the defendant fails to show he or she did not recklessly or negligently place him- or herself in circumstances in which he would probably be forced to commit a crime." 115 Am. Jur. 3d *Proof of Facts* §4 (2022).

---

[18] Dr. Hardin stated that his condition would have become life-threatening in another 24-hours. *See supra*, at 11 ¶ 59.

Powers, who testified that he was an experienced outdoorsman with decades living in Arizona, was going on a relatively long and strenuous hike in a wilderness area in the Upper Sonoran Desert during Stage 2 fire restriction with daytime temperatures over 100 degrees. He further testified that he knew the area was hot, knew the area was dry, and knew of the fire restrictions. Yet, he only brought about 116 ounces of water for a hike that was at least 18.8 miles long. While the defendant maintained at trial that this was enough water for his planned hike, Dr. Hardin's testimony and common sense, contradicts that claim. The Court finds that Powers' testimony that he had sufficient water for the hike not credible. During his initial interviews in 2018 that were recorded on body camera, Powers indicated that he expected to find water on the trail. (*E.g.*, Pl. Ex. 7, 7:54-8:22.; Pl. Ex. 8, 7:45-8:50.) At trial, Powers testified that he knew it was dry and he would not find water before he started the hike, but that he had enough water with him. Powers also brought minimal food items, certainly not enough for the conditions faced or even the planned distance.

In addition to lack of water, Powers recklessly relied on one device (his cellphone) for navigation, communication, and as a light source. Cell service in the Sycamore Canyon Wilderness Area was sporadic and largely unavailable, a fact worth determining before depending on this coverage. This lack of service rendered his device useless for purposes of navigation and communication, especially once his battery was drained on May 28, 2018. He failed to bring paper maps, guidebook, compass or GPS. These could have kept him on trail rather than having to turn around. The court further finds that Powers failed to pack emergency essentials such as another light source, medical or first aid kit or communication or signaling device (e.g., mirror) in the event that he became lost or injured, a risk heightened when hiking solo. Powers, who claimed to be an experienced hiker, was without sufficient water, food, navigation or basic emergency precautions/gear.

"[T]he defense of necessity, or choice of evils, traditionally covered the situation where physical forces *beyond the actor's control* rendered illegal conduct the lesser of two evils." *United States v. Bailey*, 444 U.S. 394, 410 (1980) (emphasis added). Here,

the court finds that the "choice of evils" was dictated by physical forces that were under the defendant's control. Had Powers engaged in adequate preparation in planning and carried adequate water, food and gear, he would not have found himself in his circumstances. Thus, the court finds that Powers necessity defense fails as he created the conditions necessitating the commission of the fires, and his subsequent rescue.

After consideration of the testimony of witnesses, admitted exhibits, memorandum submitted by the parties, the record, and federal and state law, the Court finds Defendant, Philip Alejandro Powers III, guilty on Counts 1 through 7 of the Complaint (Compl., ECF No. 1.).

**IT IS ORDERED that**

The Clerk of the Court shall enter separate judgment accordingly.

Dated this 13th day of February, 2023.

Camille D. Bibles
United States Magistrate Judge